Evansville Oil Corporation, Jack Coast, Liquidator v. Commissioner.
Evansville Oil Corp. v. Commissioner
Docket No. 29642.
United States Tax Court
1953 Tax Ct. Memo LEXIS 403; 12 T.C.M. (CCH) 21; T.C.M. (RIA) 53016; January 16, 1953
*403 William H. Bronson, Esq., Commercial Bldg., Shreveport, La., for the petitioner. J. P. Crowes, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in petitioner's tax liability and imposed penalties as follows: Declared Value
Taxable
Excess
Excess
Delinquency
Year Ended
Income Tax
Profits Tax
Profits Tax
Fraud Penalty
Penalty
11/30/42
$ 334.90
11/30/43
1,198.78
$1,863.05
$6,710.30
$4,886.07
$1,677.58 Petitioner concedes certain adjustments but claims a net overpayment of $41,477.81 for the year ended November 30, 1942, resulting from respondent's non-recognition of a carry-back loss allegedly incurred in the taxable year ended November 30, 1943, and the non-recognition of a net operating loss carry-back of $886.64 incurred in the year ended November 30, 1944. No evidence that the latter sum in fact represented an operating loss having been introduced, this part of the claim is considered as abandoned. The questions presented are (1) whether petitioner sustained a loss during the taxable year ended November 30, 1943, from the sale of its assets; *404 (2) whether petitioner's failure to file a timely excess profits tax return for the year ended November 30, 1943, was due to willful neglect, so as to render it liable for the 25 per cent delinquency penalty; (3) whether any part of the deficiencies determined against petitioner for the year ended November 30, 1943, is due to fraud with intent to evade tax. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner is a corporation organized under the laws of Louisiana in 1936 under the name of Ecco Oil Corporation. It adopted its present name in 1937. It filed Federal income and excess profits tax returns for the taxable year ended November 30, 1942, and a Federal income tax return for the taxable year ended November 30, 1943, with the collector for the district of Louisiana on the accrual basis. J. P. Evans was president of the corporation and Byrd Hamilton, his personal secretary, was secretary-treasurer until March 10, 1943, when they resigned. Jack Coast was vice-president and general manager. Sometime after March 10, 1943, John Henry Cochran became a vice-president and Mrs. Georgia Watson became secretary-treasurer. Coast was 40 years *405 old in December, 1951. He had studied petroleum engineering at the University of Oklahoma and had worked in the refining department of Barnsdall refining Company, in the experimental department of a refinery construction and engineering company, and as an operating refinery engineer with the latter company until 1936. He was interested in petitioner from its inception as a stockholder as well as officer. According to petitioner's stock records, its outstanding stock was owned on March 21, 1943, as follows: Minors: Joan Wise, Herschell
R. Schivally, Jr., Carl Coast
2 shares
J. P. Evans, Jr.
50 shares
William S. Evans
50 shares
Edith S. Evans
50 shares
J. P. Evans
515 shares
Charles L. Mayer, Trustee
25 shares
Jack Coast
308 shares
Total
1,000 shares
The organization of petitioner came about in the following manner: J. P. Evans owned some oil wells in the Sibley field in Louisiana, but was having difficulty in disposing of the oil produced. Coast felt that it was feasible to construct a small refinery to process the production of these wells. He recommended such construction to Evans, who agreed. Petitioner was organized to construct and own the refinery. *406 Construction was begun in the fall of 1936, and completed early in 1937. Gas produced from Evans' wells in connection with the production of crude oil had been released into the air and burned until 1937. In that year, orders from the Conservation Commission of Louisiana prevented this practice; consequently, these wells were shut in and the refinery's source of crude oil was cut off. Crude oil was purchased in the open market, but the refinery operated without profit through 1939. Arrangements were made about that time with the First National Bank of Shreveport, Louisiana, whereby petitioner borrowed money to finance the moving of its refinery to the Cotton Valley Field in Louisiana, so that it would be near a source of crude oil for its refining operations. Moving was completed by the spring of 1940, and was financed by petitioner's obligation to the bank endorsed by J. P. Evans personally. Coast continued to manage the refinery's operations after 1940. From its incorporation to the time when liquidation was undertaken in 1943, petitioner was continuously troubled with financial difficulties. It was undercapitalized. J. P. Evans was personally required to endorse further obligations, *407 including those incurred for the purchase of crude oil, which often ran as high as 45,000 barrels a month at about $1.85 per barrel, and to guarantee the corporation's gasoline tax bonds to the State of Louisiana and to the United States government. Petitioner began to show a profit in the spring of 1940, and operated at a profit through the spring of 1943. For the fiscal year ended November 30, 1942, it reported a net income of $127,514.85, but petitioner had a low excess profits credit and the major portion of these earnings were subject to excess profits tax. Its financial difficulties were never relieved materially. Controls were placed on the operation of the refinery by the Petroleum Administration for War, and the refinery was shut down early in 1943 pursuant to a directive of that agency. Coast made a trip to Washington, and when it was ascertained that the directive was not intended to apply to a refinery such as that operated by petitioner, operations were resumed. While the refinery was shut down, Evans instructed Coast to arrange to dispose of the refinery. He had told Coast for some time that he wanted to get out of the refinery and the contingent, guarantor and endorser *408 obligations that he had assumed in connection with its operations. Coast attempted to sell the refinery to John B. Atkins in Shreveport on a basis which would relieve Evans of his contingent liabilities. After giving it some consideration, Atkins refused to purchase the refinery on those terms. In the early part of March 1943, in the course of a conversation with Justin R. Querbes, Evans asked Querbes if he would like to buy a refinery on terms which would relieve Evans of his contingent liabilities in connection with it. Querbes said that he might be interested, and Evans agreed to send Coast to discuss the matter further. Evans never mentioned to Querbes the purchase of any stock. Querbes was familiar with the stock ownership in petitioner, and knew that Evans owned a controlling interest. Coast conferred with Querbes in the latter's office, pursuant to Evans' instructions. Querbes told Coast that he would not consider purchasing the refinery unless he could work out some arrangement whereby Coast would operate it, since Querbes knew nothing about the refining business. Coast replied that he had been negotiating with the First National Bank of Shreveport for a loan in order to *409 buy the refinery himself, and would notify Querbes the next day as to whether he would operate the refinery for Querbes if the latter purchased it. The following day they worked out an arrangement whereby Coast would operate the refinery in return for a 49 per cent interest therein if Querbes bought it, and Querbes would own the remaining 51 per cent interest. Querbes had the refinery appraised and determined that if he purchased it and it could not be operated at a profit, he could sell it for salvage value and still not lose money. He then went to his attorney, Leon O'Quin, and told him that he had agreed to buy petitioner's physical assets on a basis that would relieve Evans of his contingent liabilities in connection with the refinery's operations; that he was actually acting for Motor Finance Company, Inc., in the transaction and that upon acquiring the assets he would form a partnership between himself, owning 51 per cent on behalf of Motor Finance Company, Inc., and Coast, owning 49 per cent and operating the refinery. Querbes advised his attorney that he had had the physical assets appraised and was satisfied that the salvage value was sufficient to insure him against any *410 loss in the transaction. He instructed O'Quin to draw up the necessary papers and consummate the transaction for him so that Querbes would acquire the refinery and other physical assets on the basis outlined. In none of the conversations among Evans, O'Quin, Coast, and Querbes was the sale of stock in petitioner ever mentioned. Only the sale and purchase of the refinery was discussed. Leon O'Quin is an attorney who has practiced in Shreveport, Louisiana, since 1919. Querbes is his client and has been since prior to 1943. O'Quin has never represented Evans as an attorney. Pursuant to Querbes' instructions, O'Quin prepared the necessary documents and attended to the other formalities by which Querbes, acting on behalf of Motor Finance Company, Inc., would acquire clear title to petitioner's refinery and other assets on a basis which would relieve Evans of his contingent liabilities in connection with the refinery. He made no arrangements other than for the acquisition of the assets. On or about March 10, 1943, he prepared a notice to be mailed to petitioner's stockholders of a stockholders' meeting to be held March 22, 1943, to consider petitioner's liquidation and the sale of its *411 assets. He also prepared proxies for execution by certain stockholders. He wanted petitioner's dissolution to be in proper and legal form so that the assets to be transferred by the liquidator to Querbes would be received with a good title. The form of notice of stockholders' meeting and proxies were given to Coast by O'Quin. The meeting notice was sent to the stockholders; the proxies were never used. On or about March 22, 1943, certificates for the shares of stock owned by J. P. Evans, J. P. Evans, Jr., William S. Evans, and Edith Evans were indorsed in blank and delivered to Coast. Charles L. Mayer, attorney for petitioner, wrote Coast's name in the blank space on the endorsements. A stockholders' meeting was held on that day with Coast voting not only his own stock but that of J. P. Evans and the latter's family. Coast was appointed liquidator. Evans had no agreement with anyone thereafter pertaining to it. On March 26, 1943, after O'Quin had determined to his satisfaction that Coast had been properly appointed liquidator of petitioner with authority to transfer its assets, he prepared a letter to Evans for Querbes' signature by which Querbes agreed to hold Evans harmless on *412 account of Evans' endorser and guarantor liabilities growing out of petitioner's refinery operations. O'Quin then prepared the contracts executed by Coast as liquidator of petitioner by which the refinery, other physical assets and inventory were transferred to Querbes. Consideration for this conveyance was $11,502.50, paid by Querbes directly to the Mercantile National Bank at Dallas, Texas, to discharge six notes which had been executed by the corporation and endorsed by J. P. Evans, personally, and Querbes' agreement to supply such additional amounts as might be required by the liquidator to discharge net liabilities reflected on petitioner's books. This agreement, when consummated, would have the effect of relieving Evans of his contingent liability for these obligations. The contracts transferring the physical assets and inventory to Querbes were executed on March 30, 1943. One of the instruments executed on March 30, 1943 by Coast and Querbes was as follows: "ACT OF ACKNOWLEDGMENT "WHEREAS, JACK COAST, as Liquidator of Evansville Oil Corporation, has this day sold and conveyed unto JUSTIN R. QUERBES by separate act specially referred to as part thereof all assets of the *413 business formerly conducted by Evansville Oil Corporation, other than bills and accounts receivable, for a recited consideration of ELEVEN THOUSAND FIVE HUNDRED TWO AND 50/100 ($11,502.50) DOLLARS cash and other valuable considerations; and, "WHEREAS, the true consideration for such conveyance was the sum mentioned, represented by notes of Evansville Oil Corporation, duly surrendered, and the further agreement of the purchaser to pay upon demand of the Liquidator such further and additional sums as may be required to pay and discharge all liabilities of the corporation in liquidation, as disclosed by its books and records, other than any liability reflected thereon as representing capital or the capital stock of the dissolved corporation; "THEREFORE, the parties hereto acknowledge that the true consideration of the conveyance referred to was that hereinabove set forth and the parties hereto agree that the balance of consideration to be paid by the purchaser shall be determined in the following manner: "The Liquidator shall proceed promptly in the collection of all bills and accounts due or owing to Evansville Oil Corporation and shall pay and discharge therefrom the debts and *414 liabilities of the corporation in liquidation to the fullest extent possible. Upon the expenditure of the proceeds of all such bills and accounts receivable, the purchaser of the assets of the corporation shall then advance to the Liquidator upon his demand or request therefor any and all funds necessary to pay and discharge the obligations particularly referred to, provided, however, that the purchaser may to avoid the accumulation of penalties and interest and to obtain the advantage of discounts advance sums deemed advisable in the course of liquidation, upon the condition that all such funds so advanced be returned to him from the proceeds of collections made by the Liquidator, it being expressly understood that in no event shall payments made by the purchaser of the assets of the corporation in liquidation exceed the amount necessary to finally liquidate that corporation and that any and all sums received by the Liquidator after the discharge of the obligations referred to specifically herein shall be paid over to the purchaser of the assets in reimbursement of advances made for the purpose of accomplishing liquidation. * * *" Pursuant to these provisions Motor Finance Company, *415 Inc., has made advances to the liquidator aggregating a net amount of $43,123.78 as shown on petitioner's books. Coast took to petitioner's attorney, Charles B. Mayer, for approval, all documents drawn by O'Quin to effect a transfer of the corporation's physical assets and inventory and relied on his advice in consummating the transaction with Querbes. The consideration received from Querbes was confirmed in a letter forwarded to Evans by Querbes dated March 26, 1943. Coast, as liquidator, retained in his possession petitioner's cash, accounts receivable and other assets other than inventory and physical assets. He has collected some or all such accounts and notes receivable and has paid accounts and notes payable, recording these collections and payments in petitioner's books. On April 1, 1943, journal notations were made on petitioner's books as follows: "To record sales of inventory and physical assets to J. R. Querbes by payment by J. R. Querbes to Mercantile National Bank of this company's notes endorsed by J. P. Evans personally. "To record sale of inventory to J. R. Querbes at 7:00 A.M., April 1, 1943, as per contract." The refinery, physical assets, and inventory on *416 March 30, 1943, had an adjusted basis on petitioner's books of $85,545.77. In the post-closing trial balance of March 31, 1943, prior to posting entries of April 1, 1943, petitioner's books showed inventory of $26,226.72, equipment of $114,217.74, and depreciation reserve of $48,898.69. In April 1943, an opening journal entry was made on the books of Coast Oil Company, a partnership organized by Coast and Querbes pursuant to their prior agreement, which included the following explanation: "To record the purchase of physical assets of Evansville Oil Company per contract of sale between Jack Coast, Liquidator and Coast Oil Co." The partnership proceeded to operate the plant acquired from petitioner. For the years 1943 to 1945, Coast Oil Company reported net income from its operations as follows: 1943
$163,274.93
1944
283,990.31
1945
178,634.93
Coast had no conversation with Evans concerning the receipt of the stock which Evans had endorsed, the voting of this stock or the liquidation of the corporation. O'Quin, who was acting as attorney for Querbes, told Coast the stock would be delivered to him, and the various steps taken by Coast in the liquidation of *417 the corporation were taken under O'Quin's direction. J. P. Evans was burdened with large contingent, guarantor and endorser liabilities in connection with the operations of petitioner's refinery and he, as president of petitioner, was willing for the corporation to dispose of the refinery on a basis that would relieve him of those obligations. He further felt that if the refinery were disposed of on that basis the stock in petitioner would have no value. He caused his stock and that of the members of his immediate family to be delivered to Coast endorsed in blank with full authority on Coast's part to vote the stock at a stockholders meeting to disolve the corporation and dispose of its assets on a basis that would relieve him of his liabilities in connection with the refinery. Though Evans in 1943 did not think that the liquidation of petitioner would result in any equity for the stockholders, nevertheless, if it did and if the liquidator tenders him his proportionate value of the equity based on his stock ownership, he will decide at that time whether or not to accept it. At the time the J. P. Evans stock and that of his immediate family was delivered to Coast it was thought *418 to be worthless, petitioner had to be liquidated, Coast was the logical liquidator, and the stock was delivered to him endorsed in blank so that he could vote it at a stockholders' meeting to place petitioner in liquidation in lieu of using proxies. William S. Evans was in New Haven, Connecticut, and J. P. Evans, Jr., was in Jackson, Mississippi, at the time of the transaction. Coast did not pay J. P. Evans, J. P. Evans, Jr., William S. Evans or Edith S. Evans anything for the stock that was delivered to him endorsed in blank. Coast does not own the Evans stock that was delivered to him endorsed in blank and if it develops that the stock has value he as liquidator will pay any such equity remaining for stockholders to the owners of that stock. At no time during the entire negotiations leading up to the transaction and at no time through the consummation of the transaction was it ever mentioned or suggested that Querbes was buying stock from J. P. Evans. Evans approached Querbes on the basis of selling Querbes a refinery and it was the refinery that was the subject of their transaction. Querbes has never at any time had in his possession or seen any of the stock of petitioner. The *419 documents drawn by Querbes' attorney and approved by the attorney for petitioner reduce to writing a transaction by which Querbes acquired assets from petitioner for a consideration to petitioner that had the effect of relieving J. P. Evans of his contingent, endorser and guarantor liabilities. On March 30, 1943, Querbes (acting for Motor Finance Company, Inc.) acquired from petitioner, in liquidation, certain assets of petitioner. He has not purchased from J. P. Evans or anyone else stock in petitioner and does not own any such stock. Royal H. Frost, Jr., is a certified public accountant in Shreveport, Louisiana. He has practiced accountancy in Shreveport since 1934. In 1943 and 1944 he was with the firm of Frost & Heard and is presently with the firm of Frost & Frost. He has for many years been engaged in the business of preparing income tax and excess profits tax returns for corporations, as well as making audits for various businesses and his audit reports are relied upon by institutions in Shreveport and elsewhere. Frost was employed by petitioner, Jack Coast, Liquidator, to prepare the income and declared value excess profits tax return for the corporation for the fiscal *420 year ended November 30, 1943, and he did prepare that return as well as the income and declared value excess profits return for the fiscal year ended November 30, 1944. Frost advised petitioner, Jack Coast, Liquidator, that the income and declared value excess-profits tax return for the fiscal year ended November 30, 1943, of petitioner, Jack Coast, Liquidator, was true and correct and reflected what it purported to reflect. Frost examined the books and prepared the income and declared-value excess profits tax return for the year ended November 30, 1943, for petitioner some time after March 30, 1943. He took no part himself in the transfer of assets by Coast as liquidator to Querbes, acting for Motor Finance Company, Inc. and was not consulted in connection therewith. When he made his examination preliminary to preparing the return Coast did not tell him that the transaction resulted in a loss. Frost prepared the return and presented it to Coast for the latter's signature. Frost conferred with one Lieber, Querbes' representative, prior to the preparation of the return. Frost believed at that time and still believes that the loss existed. Petitioner's income and declared value excess-profits *421 tax return for the fiscal year ended November 30, 1943, reported a net loss of $56,148.28. The following details were set out in Schedule D of the return: 3. Gross Sales Price
$ 8,170.78
4. Cost or other basis
109,217.74
5. Expense of Sale, etc.
5,000.00
6. Depreciation allowed, etc.
49,898.68
7. Loss
56,148.28 The inventory of $26,226.72 which was transferred to Querbes was included in item #2 on page one of that return as a Cost of Goods Sold. Frost filed petitioner's income and declared value excess-profits tax return for the year ended November 30, 1943 after having obtained Coast's signature on it, as liquidator. Coast's education, background and experience is in the field of petroleum engineering, petroleum refinery engineering, construction and operation. He is not trained in accountancy. Opinion In its legal aspects the present proceeding belongs to the family of , and . Its cousins are such cases as , and ; *422 cf. , affirmed (C.A. 3), ; . The difference is that we are presently dealing with the converse of that problem, the question being whether a loss on the sale is attributable to petitioner, the corporation which previously owned the assets, or must be considered eliminated because petitioner did not make any sale. As will appear from our subsequent discussion, other peculiarities are present which, however, tend to facilitate the decision. Although any loss would obviously redound to the corporation itself and to those who were at the time its stockholders, the articulation of the transaction was left in the hands of the purchasers who, contrary to what would appear to be their selfish interests at least as to the tax consequences of the sale, proceeded to prepare all documents and enter all items on the books of account on the theory that it was the corporation which remained in a position to benefit by any loss. We have hence not only an armslength transaction ordinarily to be taken at its face value, see, e.g., ; *423 , but in addition the circumstance that the impelling force for the treatment giving rise to tax consequences proceeded from the parties least in a position to benefit from the form in which the arrangement was cast. Cf. , affirmed (C.A. 8), , certiorari denied, . The case is presented by both parties as though the factual interpretation to be placed upon the central transaction is dispositive of the basic issue. In our findings we have indicated that we consider petitioner's version to be supported by the record. There is in fact little if any evidence tending in the opposite direction. It seems clear that petitioner's principal stockholder, Evans, considered that petitioner's stock had no significant value. He was interested in terminating his investment. He hoped to avoid any loss to himself, an eventuality which appeared to have been readily possible in view of his large commitments as guarantor of petitioner's liabilities. The result was that the offer to purchase from petitioner its physical assets in consideration of the *424 discharge of all its liabilities gave Evans the relief he desired. The transmission of his stock and that of the other stockholders to the liquidator so that he could legally transfer petitioner's physical assets and be in a position to liquidate its liabilities was evidently thought of as a purely formal prerequisite to the main purpose of the operation. Nevertheless, the liquidator's testimony left no doubt that the original stockholders were considered as still the owners of the corporate stock and that if the liquidation should result in any net proceeds these would be transferred not to the new owners of the assets but to the old stockholders. We think it a necessary conclusion that it was the assets and not the stock that were considered by all parties to have been sold. . Not only is there no evidence to cast uncertainty upon this testimony but the fact is that the liquidator was testifying against his financial interests and those of his present associates in disclaiming any right to liquidating dividends. And Evans, whose testimony was not inconsistent, having been called by respondent was necessarily tendered by him *425 as a credible witness. It follows that any loss on the sale of the assets was petitioner's loss which it is entitled to carry back to the prior year and that the overpayment claimed on this ground, if one appears upon the recomputation must be allowed. On this disposition of the case the fraud charge naturally appears somewhat ridiculous. There is no evidence to support it and the determination is disapproved. Respondent insists in addition that even if petitioner suffered a loss, it is not deductible for failure to complete the transaction in the instant year. But the property was transferred and the consideration agreed upon. Petitioner being on the accrual basis, there is no reason to doubt that the transaction was properly treated as having occurred in fiscal 1943. ; ; ; . The amount of the loss, however, is another question. The facts indicate that what was paid for the assets was not only the $11,502.50 immediately transmitted to *426 the Mercantile National Bank in discharge of petitioner's obligations to it, but the additional $43,123.78 which both parties agree was ultimately provided for liquidation of the corporation's debts and which was advanced before the end of fiscal 1943. Since this total was the consideration received by petitioner for the property, its loss must be computed by deducting the aggregate of those sums from the agreed basis of the property. It is impossible to be certain that the delinquency penalty is no longer in issue, although if petitioner's description of the question were correct, there would be no deficiency in excess profts tax, and hence no possible penalty. Under these circumstances we prefer to postpone consideration of this question until a hearing on the recomputation at which time, if respondent contends that a penalty would be chargeable, leave is granted to him to raise the question. Decision will be entered under Rule 50.